IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RICHARD D. NIDAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 19-00195-CV-W-ODS |
| | ) |
| MICHAEL S. BULLOCH, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending is Defendants' Motion for Summary Judgment. Doc. #31. For the following reasons, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND[1]

In 1994, Defendant Michael Bulloch created Ayr United Freight, Inc. Ayr United is an international freight forwarder, which is a broker that moves freight for companies. Ayr United acquired the Denver franchise of AIT Worldwide Logistics, Inc., a freight company. In 2011, Bulloch created Defendant Scottish Express LLC, an international freight forwarder, to acquire AIT's Kansas City franchise. AIT gave Bulloch the Kansas City franchise at no cost, but Scottish Express paid a royalty to AIT when it moved freight. In January 2012, Bulloch hired Plaintiff Richard Niday as branch[2] manager for Scottish Express. As branch manager, Niday was responsible for all profit and loss, including maintaining and increasing the profitability of the Kansas City branch.

In the summer of 2017, Bulloch approached AIT to gauge its interest in purchasing Ayr United and/or Scottish Express. According to Bulloch, AIT was interested in purchasing the franchises. The eventual sale of Ayr United and Scottish Express to AIT is the impetus for this lawsuit.

---

[1] Unless otherwise noted, the facts in this section are uncontroverted by the parties. Nothing in the background section should be construed as a finding of fact by the Court.
[2] The parties use "branch" and "station" interchangeably. To avoid confusion, the Court uses branch.

Niday claims he and Bulloch reached a verbal agreement in October 2017 that if Scottish Express was sold to AIT, Bulloch would receive sixty percent of the proceeds, and Niday would receive forty percent of the proceeds. Niday admits this conversation was not put in writing at the time and no agreement was signed. Bulloch acknowledged he "may have asked" for Niday's advice about potentially selling Scottish Express to AIT. But Bulloch does not recall talking with Niday about splitting the sale proceeds.

On January 22, 2018, Bulloch discussed sale terms with AIT. Niday alleges Bulloch sent the following text messages[3] to Niday on January 23, 2018:



Doc. #34-2, at 2; Doc. #34-4, at 117; Doc. #34-6, at 1-4.[4] Niday contends Bulloch's January 23, 2018 text messages confirm in writing their October 2017 verbal agreement. Per the message, Niday would receive $2.2 million in cash, $400,000 in

---

[3] Niday and Bulloch communicated about business via text, email, phone, and in-person. Bulloch's cell phone number ended with 3376, and Niday's cell phone number ended with 9040. Niday produced what he claims are the text messages exchanged between Niday and Bulloch. Doc. #34-5, at 60-62; Doc. #34-6. During his deposition, Niday offered Bulloch's counsel the opportunity to view and copy the text messages. Doc. #34-5, at 86. He also agreed to use a software program to download the text messages in a "machine readable format." *Id.* at 90-91. It is unknown if Bulloch's counsel viewed or copied the text messages or if Niday downloaded the text messages in a machine readable format. Bulloch routinely testified he did not recall sending or receiving the text messages produced by Niday, but he did not provide conflicting text messages or evidence disputing the content of the text messages produced by Niday.

[4] EBITDA, which is a method for determining a company's value, stands for earnings before interest, taxes, depreciation, and amortization. Doc. #34-1, at 30; Doc. #34-3, at 62-63; Doc. #37, at 9.

stock, and $400,000 in "incentive carry over," for a total of $3 million. When deposed, Bulloch was asked if he admitted or denied sending these text messages. Bulloch testified, "I don't recall sending this text." Doc. #34-3, at 62. Bulloch, however, admitted 40% of $7.5 million is $3 million.

Niday claims he sent the following messages to Bulloch on January 23, 2018:



Doc. #34-4, at 118. Niday maintains Bulloch responded the same day with the following text messages:



3

Doc. #34-4, at 119.  When asked if he admitted or denied sending the foregoing text messages, Bulloch testified, "I don't recall sending these texts."  Doc. #34-3, at 65.

According to Niday, he and Bulloch continued exchanging text messages on January 23, 2018:



> **Me**
> Ok, well I did not know all that, Scott. The last we talked you were saying you were going to take it on the open market. How can they terminate your contract for countering after Boston and Detroit took them thru the ringer?
> 7:15 PM
>
> **Scott Bulloch**
> Because they believe most of the business is theirs already- Sprint / Hallmark / Hunter Douglas etc etc. We discussed this, you pointed it out to me that it
> 8:03 PM
>
> **Scott Bulloch**
> would be near impossible to flip any account to any other company. I am trying my best poker face with this.
>
> And if it is a big year then they get to recoup
> 8:03 PM
>
> **Scott Bulloch**
> the money paid out - conversely Sprint could turn round and reject Ait and Hallmark could blow up in one big damage claim.
> 8:03 PM
>
> **Me**
> Well, I still don't understand how they can threaten to terminate your contract without cause? But, if that is what you want to do I am with you.
> 8:19 PM

Doc. #34-4, at 119-20.  Bulloch does not recall sending the foregoing text messages. Doc. #34-3, at 69.

On February 7, 2018, AIT sent a letter of intent to Bulloch setting forth AIT's "proposal…to acquire…substantially all of the assets of" Ayr United and Scottish Express.  Doc. #36, at 1.  According to the letter, "the purchase price for the assets…will be…$8,500,000," which will be "paid at closing" as "a mixture of cash and stock in AIT."  *Id*.  Of the $8.5 million, the value placed on Scottish Express was $7.5 million, and the value attributed to Ayr United was $1 million.  *Id*.  "The earnout of $1,000,000…will be earned if [Ayr United and Scottish Express] achieve $1,700,000 of

4

EBITDA…for the first full trailing twelve months following the closing of the Acquisition." *Id.* AIT states, "this proposal letter is not intended to be a binding agreement, but merely an expression of the current desire of the parties to evaluate" the potential sale of Ayr United and Scottish Express to AIT. *Id.* at 3. "No party will be under any obligation to proceed…unless and until a definite agreement has been executed…." *Id.* The letter instructs Bulloch to sign the letter "[i]f the terms…are acceptable." *Id.* Bulloch signed the letter on behalf of Ayr United and Scottish Express. *Id.* at 5.

On April 17, 2018, Bulloch and Niday exchanged the following text messages:



Doc. #34-5, at 155. Bulloch testified he did not recall sending these text messages. Doc. #34-3, at 73-74. But, when responding to Niday's additional statement of facts accompanying his summary judgment opposition brief, Bulloch represented it was "[u]ncontroverted" that he sent these text messages on April 17, 2018. Doc. #46, at 10. So, the Court deems this fact uncontroverted.[5]

---

[5] Based on the record before the Court, it appears Niday and Bulloch also exchanged emails on April 23, 2018. Niday purportedly emailed Bulloch asking about the details for wiring money from the payout, and Bulloch indicating a contract between Niday and Scottish Express would be completed before the payout. Bulloch does not recall receiving or responding to the emails. Doc. #34-3, at 79-81. The emails are referenced in questions asked during a deposition. While the deposition transcript was provided, the emails were not provided to the Court. Moreover, the emails were not discussed in the parties' statements of fact. Because the parties failed to set forth facts related to these emails (which ostensibly would have been supported by the actual emails), these facts have not been established. Fed. R. Civ. P. 56(c)(1); L.R. 56.1(a), (d).

Niday claims he and Bulloch exchanged the following text messages on April 28, 2018:



Doc. #34-4, at 159-60. Bulloch does not recall receiving or sending these text messages. Doc. #34-3, at 83. Niday maintains he also sent text messages to Bulloch, on April 30, 2018, the date the sale closed. Therein, Niday congratulates Bulloch on the sale and provides routing and account numbers for his bank. Doc. #34-4, at 160. Bulloch does not recall receiving these text messages. Doc. #34-3, at 85.

On April 30, 2018, AIT, Scottish Express, Ayr United, and Bulloch executed an asset purchase agreement ("APA"). Doc. #37. In the APA, Bulloch is identified as "the sole record and beneficial owner of all the issued and outstanding shares [of] Seller's capital stock or membership interests." *Id.* at 2. Pursuant to the APA, the purchase price was set forth as follows:

> 2.1 Purchase Price.
>
> (a) The aggregate purchase price (the "Purchase Price") for the Purchased Assets shall be equal to (i) Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Base Purchase Price"), plus (ii) shares of AIT Worldwide Logistics Holdings, Inc.…in an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000) (the "Shares"), to be issued to Scottish Express…, plus (iv) the Earnout Payment Amount….
>
> (b) Buyer shall pay the Base Purchase Price at Closing by wire transfer…as follows: (i) Five Million Five Hundred Twenty-Nine Thousand Four Hundred Twelve Dollars ($5,529,412) to Scottish Express, minus the Closing Seller Prorations attributable to Scottish Express and (ii) Nine Hundred Seventy Thousand Five Hundred Eighty-Eight Dollars ($970,588) to Ayr United Freight, minus the Closing Seller Prorations attributable to Ayr United Freight (collectively, the "Initial Payment").

6

Doc. #37, at 6-7. Regarding the "earnout payment," the APA set forth the following:

    2.2.   <u>Earnout Payment</u>.

        (a)   <u>Determination of Earnout Payment</u>. As additional consideration for the Purchased Assets…, Buyer…shall pay to Scottish Express…One Million Dollars ($1,000,000) (the "<u>Earnout Payment Amount</u>") if the Business achieves the Earnout Target during the Earnout Period…. If the Earnout Target is not achieved during the Earnout Period, no Earnout Payment Amount shall be paid.

        (b)   <u>Definitions</u>.

            (i)   "<u>Earnout Period</u>" means the period beginning on the Closing Date and ending on April 30, 2019.

            (ii)   "<u>Earnout Target</u>" means…an EBITDA of at least One Million Seven Hundred Thousand Dollars ($1,700,000)….

            (iii)   "EBITDA" means…the net income before interest, income taxes, depreciation and amortization of the Ayr Freight United and Scottish Express, collectively….

Doc. #37, at 8-10. Pursuant the APA, Bulloch agreed not to "directly or indirectly, own any interest in, manage, control, participate in…, consult with, render services for or otherwise engage in any business…that provides freight-shipping and/or logistics services and products business" in Colorado and in counties identified in Wyoming, Missouri, and Kansas for five years. Doc. #37, at 12.

In the APA, Niday is listed as Scottish Express's "regional manager" with an annual salary of $165,100 and "additional compensation in the form of a company car, car insurance, reimbursement of expenses, and 6% sales commission on monthly paid total sales." Doc. #37, at 22, 151. In 2017, Niday's compensation was $296,267.06, which included his "regular salary of $165,100, bonus of $123,123.79, and…$8,043.27 for the company car and car insurance." *Id*.

On April 30, 2018, the sale closed. Of the $7.5 million allocated to the sale of Scottish Express, $5,750,000 was paid in cash; $750,000 was paid in AIT stock; and $1 million was to be paid after April 30, 2019, pursuant to an "earnout" provision. The Kansas City branch met the EBITDA projections between April 30, 2018, and April 30, 2019, and earned the $1 million payout. Pursuant to an agreement between Bulloch and Niday, AIT wired the $1 million to an escrow account sometime in July or August 2019. Doc. #39.

After the sale, Bulloch signed over to Niday the title to the Range Rover that Niday used during his employment with Scottish Express. In the APA, AIT agreed to offer employment to Scottish Express's employees, including Niday. Doc. #37, at 28. Niday accepted employment with AIT and continued serving as branch manager in Kansas City. AIT paid Niday a six percent commission; however, his sales at AIT produced a lower commission than the same sales generated in commission at Scottish Express. Niday received no proceeds from the sale of Scottish Express to AIT.

In February 2019, Niday filed a lawsuit in the Circuit Court of Jackson County, Missouri, against Bulloch, Scottish Express, and AIT. Doc. #1-1, at 2-13. Bulloch and Scottish Express removed the matter to this Court. Doc. #1. Pursuant to the parties' stipulation, Niday's claims against AIT were dismissed without prejudice in May 2019. Doc. #19. In July 2019, Niday filed an amended complaint, alleging claims of breach of contract, promissory estoppel, unjust enrichment, and conversion, and seeking monetary and injunctive relief. Doc. #25. Now pending is Defendants' motion for summary judgment. Doc. #31.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). The Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588-89 (1986). "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth

specific facts sufficient to raise a genuine issue for trial." *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (citations omitted).

### III. DISCUSSION
### A. Breach of Contract Claim

Niday alleges Defendants breached a verbal agreement that he and Bulloch reached in October 2017 to split the proceeds from the sale of Scottish Express to AIT. Defendants argue they are entitled to summary judgment on Niday's breach of contract claim because (1) the alleged agreement is barred by the statute of frauds, (2) the alleged agreement lacks consideration, and (3) no contract exists due to lack of clear performance and definiteness.

#### (1) Statute of Frauds

Defendants argue the alleged agreement between Niday and Bulloch is barred by the statute of frauds. Under Missouri law, "[n]o action shall be brought…upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith…." Mo. Rev. Stat. § 432.010.[6] "The longstanding interpretation of the one year provision in this statute of frauds is that an oral contract for a definite period of time exceeding one year falls within the statute and is unenforceable…." *Vess Beverages, Inc. v. Paddington Corp.*, 886 F.2d 208, 212 (8th Cir. 1989) (citations omitted). To the extent there was an oral agreement between Niday and Bulloch, it was reached in October 2017. Doc. #32, at 9-10; Doc. #34, at 4, 5, 8, 9, 16, 17; Doc. #34-5, at 63. The Court must determine whether the alleged agreement was for a definite period of time exceeding one year or could not be performed within one year of October 2017.

Regarding this issue, Defendants' sole argument is Niday's obligations under the agreement ran until April 2019, and thus, his obligations could not be performed within one year of October 2017. Doc. #32, at 9-10. Niday's deposition testimony is the only

---

[6] Both parties cite Missouri law. The Court does the same.

9

support for their argument. But their representations about and citations to his testimony do not tell the complete story. *Id.* Defendants correctly represent Niday testified he and Bulloch discussed Niday staying as branch manager in Kansas City until April 2019. Doc. #34-5, at 64. And, they correctly quote Niday's testimony – to wit, "initially we talked about" him "stay[ing] on for at least one year…." Doc. #32, at 10.

What is perhaps most significant is Niday's testimony that this was the plan he and Bulloch "initially" discussed. Absent from Defendants' argument is Niday's detailed testimony about his plan to leave Scottish Express (once it was sold to AIT) and work with Bulloch at CubeLogix, a company that manufactured collapsible, trackable shipping containers. *Id.* at 40-41, 66-72. Niday testified he was operating "under the assumption that [he] was going to CubeLogix," and he understood he "would have to exist off of" the proceeds from the sale of Scottish Express to AIT "until such time as CubeLogix became profitable." *Id.* at 69-71. Niday even discussed these plans with an AIT employee. *Id.* at 40. It was only two or three weeks prior to the sale closing that AIT (not Bulloch) asked Niday to work for AIT. *Id.* at 41, 67-72. Thus, contrary to Defendants' representation, the record does not demonstrate the alleged agreement between Niday and Bulloch required Niday to be employed by AIT for at least one year after the sale closed on April 30, 2018.[7]

Niday maintains the alleged agreement – to split the proceeds of the sale of Scottish Express to AIT – was performable within one year of October 2017. There is nothing in the record indicating the alleged agreement between Niday and Bulloch "was for a definite period of time exceeding one year." *Vess Beverages, Inc.*, 886 F.2d at 212. Moreover, the alleged agreement was performable and indeed was performed within less than a year after the alleged agreement was made in October 2017. That is,

---

[7] The APA's earnout provision, which ran from April 30, 2018, to April 30, 2019, was not discussed in Defendants' statute of frauds argument. In response to Defendants' motion, Niday asserts the APA's inclusion of an "earnout" to be paid on or after April 30, 2019, does not render the alleged agreement unable to be performed in one year. In the reply, Defendants seem to agree, stating the earnout provision "did not yet exist" in October 2017" and "could not have been performed even hypothetically within one year…." Doc. #46, at 12.

on April 30, 2018, the sale closed, Scottish Express's assets were sold and/or assigned to AIT, and AIT paid Bulloch $5.75 million in cash and $750,000 in AIT stock.

For the foregoing reasons, the Court finds the alleged agreement is not barred by the statute of frauds. Accordingly, Defendants' motion for summary judgment on Niday's breach of contract claim is denied with regard to Defendants' statute of frauds argument.

### (2) Consideration

Defendants argue they are entitled to summary judgment on Niday's breach of contract claim due to the alleged agreement lacking consideration. For a contract to exist, there must be "offer, acceptance, and bargained for consideration." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014) (citation and internal quotations omitted). Defendants do not address offer and acceptance but focus on consideration. "Consideration 'consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party.'" *Id.* (quoting *Morrow v. Hallmark Cards, Inc.,* 273 S.W.3d 15, 25 (Mo. Ct. App. 2008)). Consideration may be "some right, interest, profit, or benefit accruing to one party, or some forbearance, loss or responsibility, given, suffered or undertaken by the other." *Moore v. Seabaugh*, 684 S.W.2d 492, 496 (Mo. Ct. App. 1984) (citation omitted).

Defendants claim Niday's continued employment with Scottish Express and later AIT and his responsibility to maintain the profitability of the Kansas City branch are not consideration. Before and after the sale, Niday's responsibilities at the Kansas City branch remained unchanged, and he was compensated for performing his job responsibilities. But Niday does not rely solely on his continued employment. Niday argues the alleged agreement is also supported by the following consideration: (1) his "lost income from…CubeLogix…when Bulloch agreed not to compete with AIT," (2) his "lost income from a lower commission as an AIT employee," and (3) "the benefit to Bulloch of being able to sell a business he was tired of running and for which he paid nothing." Doc. #34, at 19-21; Doc. #34-5, at 41-42, 82-83. Defendants contend Niday's arguments fail because Niday was not legally entitled to continued employment, he had no legally enforceable right to assist or prevent Bulloch from selling Scottish Express,

and he offered no benefit other than his job duties. Doc. #46, at 15. Although they do not cite any authority in support, Defendants also claim "the benefit to Bulloch of being able to sell a business…for which he paid nothing" is not valid consideration. *Id.*

Based on the record and viewing the evidence in the light most favorable to Niday, the Court cannot find – as requested by Defendants – that the alleged agreement is not supported by consideration. While the existence of a contract is usually a question of law for the Court, it becomes a question for the jury when the facts surrounding the alleged contract are disputed. *O.R.S. Distilling Co. v. Brown-Forman Corp.*, 972 F.2d 924, 926 (8th Cir. 1992) (citations omitted); *Earl v. St. Louis Univ.*, 875 S.W.2d 234, 237 (Mo. Ct. App. 1994) (finding if the determination as to whether consideration sufficiently establishes a contract "necessarily turns on disputed facts, then the jury…must decide the issue.") (citation omitted). Because the issue of whether the alleged agreement is supported by consideration is dependent on disputed facts, the jury must decide whether the consideration sufficiently establishes the alleged contract. Accordingly, the Court denies Defendants' motion for summary judgment on Niday's breach of contract claim on the basis of lack of consideration.

### *(3)   Performance and Definiteness of Terms*

Defendants argue there is no agreement between Niday and Bulloch because the alleged performance is not referable solely to the alleged agreement and the alleged agreement lacks definiteness. Defendants set forth eight canons, including performance being referable solely to the contract, they believe the Court must consider when deciding whether to enforce the alleged oral agreement. Doc. #32, at 12. But the sole decision cited by Defendants determined those canons were inapplicable when enforcing an oral contract that does not fall within the statute of frauds. *Scott v. Pub. Sch. Ret. Sys. of Mo.*, 764 F. Supp. 2d 1151, 1162 (W.D. Mo. 2011). Based on the Court's analysis *supra*, section III(A)(1), the alleged agreement does not fall within the statute of frauds. Thus, the Court does not apply the eight canons cited by Defendants, and Defendants' motion for summary judgment based on this argument is denied.

## B. Promissory Estoppel Claim

Defendants move for summary judgment on Niday's promissory estoppel claim because it is barred by the statute of frauds. Because the Court decided the alleged agreement is not barred by the statute of frauds, Niday's promissory estoppel claim is not barred by the statute of frauds.

In the alternative, Defendants seek summary judgment on Niday's promissory estoppel claim because there is no detrimental reliance. To establish a promissory estoppel claim, a party must show: "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citations omitted). The Court finds genuine issues of material fact prevent it from entering summary judgment in Defendants' favor on this claim. Accordingly, Defendants' motion for summary judgment on Niday's promissory estoppel claim is denied.

## C. Unjust Enrichment Claim

Defendants move for summary judgment on Niday's unjust enrichment claim, arguing the claim fails because Defendants did not unjustly retain a benefit. To establish an unjust enrichment claim, a plaintiff must demonstrate (1) "the defendant was enriched by the receipt of a benefit," (2) "the enrichment was at the expense of the plaintiff," and (3) "it would be unjust to allow the defendant to retain the benefit." *Roberts v. Roberts*, 580 S.W.3d 600, 605 (Mo. Ct. App. 2019) (citations omitted). "The third element, unjust retention of the benefit, is considered the most significant and the most difficult of the elements. Mere receipt of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." *Id.* (quoting *Exec. Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.*, 280 S.W.3d 678, 697 (Mo. Ct. App. 2009) (internal citations omitted)). The Court finds genuine issues of material fact prevent entry of summary judgment in Defendants' favor on this claim. Thus, the Court denies Defendants' motion for summary judgment on Niday's unjust enrichment claim.

### D. Conversion Claim

In his Amended Complaint, Niday alleged Defendants "took possession" of Niday's "40% in sales proceeds ($3 million) with the intent to exercise control" over the sale proceeds and deprived Niday of the right to possession of his sale proceeds. Doc. #25, ¶¶ 66-67. Defendants move for summary judgment on Niday's conversion claim because the claim involves money.

Conversion is defined as "the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Maples v. United Sav. & Loan Ass'n*, 686 S.W.2d 525, 527 (Mo. Ct. App. 1985) (citations omitted). There are three ways conversion may be proved: (1) "tortious taking"; (2) "any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the owner's rights"; or (3) "refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper." *Gadberry v. Bird*, 191 S.W.3d 673, 675 (Mo. Ct. App. 2006) (citation and internal quotations omitted). "Conversion is not generally a proper theory when a claim involves money" but there are exceptions to the rule. *Id.* at 675-76 (citations omitted).

When the sale of Scottish Express closed on April 30, 2018, AIT paid $5,750,000 in cash and issued AIT stock worth $750,000 to Scottish Express. More than a year later, AIT paid $1 million into an escrow account for the Kansas City branch satisfying the APA's earnout provision. Niday claims his agreement with Bulloch entitled him to forty percent of each category of payment.

Regarding AIT's $5,750,000 payment, Niday has not presented evidence of a check that "can be described or identified as specific chattel." *Moore Equip. Co. v. Callen Constr. Co.*, 299 S.W.3d 678, 681 (Mo. Ct. App. 2009) (finding "the check was identifiable" by check number and amount, and thus, "constituted specific chattel for which a claim for conversion could be maintained."); *see also Shaffer v. Health Acquisition Co.*, No. 18-CV-00601, 2019 WL 1049392, at *3 (W.D. Mo. Mar. 5, 2019) (noting "[m]oney may be subject to conversion when it can be 'described or identified as a specific chattel'") (citation omitted); *Capitol Indem. Corp. v. Citizens Nat'l Bank of Ft. Scott, N.A.*, 8 S.W.3d 893, 900 (Mo. Ct. App. 2000) (affirming the trial court's judgment because, among other things, the plaintiff "never specifically identified any checks, their

14

amounts, or when they were paid."). Additionally, Niday does not show that the only funds in the account receiving the money from AIT were from the April 30, 2018 payment, no additional deposits were made, and no withdrawals were taken. *See Reason v. Payne*, 793 S.W.2d 471, 475 (Mo. Ct. App. 1990) (finding a conversion claim could be brought when money was deposited in an account from which no withdrawals or deposits were made); *see also Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 415-16 (Mo. Ct. App. 2000). In addition, Niday's conversion claim is based on Defendants' receipt and retention of money he claims he was owed. But his claim is not based on a "specific amount paid for a specific purpose," and there is no record of the money being diverted. Thus, Niday cannot bring a claim for conversion. *See Citimortgage, Inc. v. K. Hovnanian Am. Mortg., LLC*, No. 12-CV-1852, 2013 WL 5355471, at *2 (E.D. Mo. Sept. 20, 2013) (citation omitted).[8]

With regard to the stock, AIT issued stock to Scottish Express in its name. The stock was not issued to Niday and was not in Niday's name. Fatal to his claim, Niday has not established the stock was his personal property or he had an ownership right in the stock. *See Lacks v. R. Rowland & Co.*, 718 S.W.2d 513, 515-19 (Mo. Ct. App. 1986) (noting conversion occurred when the defendant took possession of stock certificates, which were in the plaintiff's name, and refused to return stock certificates when demanded by the plaintiff). Rather, any ownership right he may have in the stock is disputed. In addition, nothing in the record establishes the stock shares have remain unchanged. To wit, it is unknown if the stock was sold or converted, and if it was sold or converted, Niday does not identify – much less, specifically identify – those changes so that the stock is identifiable. For the foregoing reasons, Niday cannot bring a conversion claim related to the AIT stock.

---

[8] To support his argument that he may bring a conversion claim, Niday also cites *Asbury Carbons, Inc. v. Sw. Bank*, No. 4:10-CV-878 CEJ, 2011 WL 1086067, at *4 (E.D. Mo. Mar. 22, 2011). But Niday does not allege a security interest in the money at issue nor contends the funds can be identified by equitable tracing. *Id.* (denying a motion to dismiss because the plaintiff "adequately stated a claim for conversion of the specific payments over which plaintiff held a superior security interest and over which defendant wrongfully exercised control by directing borrowers to submit the payments to defendant instead of to plaintiff.").

Finally, there is the $1 million earnout payment, which is being held in escrow. A third party possesses the funds; Defendants do not. Additionally, there is nothing in the record establishing the funds were "divert[ed] for other than such specified purpose." *Dillard v. Payne,* 615 S.W.2d 53, 55 (Mo. 1981) (citations omitted). Defendants have not assumed the right of ownership over the $1 million, and as best the Court can discern, they have not used the money for an unauthorized purpose or used the money in any way indicating a claim of right in ownership. Accordingly, Niday cannot assert a conversion claim for the $1 million paid pursuant to the earnout provision.

In summary, Niday fails to describe or identify specific chattel. Instead, he contends "the funds at issue are specifically identifiable in accounts," and therefore, he "should be permitted to pursue those funds via a conversion claim at trial." Doc. #34, at 27. But unsupported contentions do not establish a genuine issue of material fact exists, nor do they support a conversion claim. Further, Niday does not demonstrate he is the owner of the money and stock; rather, his alleged right to and ownership in the money or stock is disputed. Niday has not demonstrated his claim for conversion fits an exception to the general rule that conversion is not a proper claim for money. Accordingly, the Court grants Defendants' motion for summary judgment on Niday's conversion claim.

### E. Request for Injunctive Relief

Finally, Defendants move for summary judgment on Niday's request for injunctive relief because (1) the request for injunctive relief is based on his other claims, which Defendants argue fail, and (2) there is no injunctive cause of action under Missouri or federal law. Niday alleges the request for injunctive relief is tied to his others claims, and because genuine issues of material fact exist regarding those claims, Defendants' motion should be denied.

As previously held by this Court, "there is no 'injunctive' cause of action under Missouri or federal law." *Jackson Cty., Mo. v. MERSCORP, Inc.*, 915 F. Supp. 2d 1064, 1072-73 (W.D. Mo. 2013). Rather, a plaintiff "must allege some wrongful conduct" by the defendants "for which [the] requested injunction is an appropriate remedy." *Id.* (citations omitted). Based on the Court's rulings in this Order, Defendants' summary

judgment motion on Niday's request for injunctive relief related to his breach of contract, promissory estoppel, and unjust enrichment claims is denied. However, Defendants' summary judgment motion on Niday's request for injunctive relief related to his conversion claim is granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's conversion claim and his request for injunctive relief related to that claim but denies Defendants' Motion for Summary Judgment in all other respects.

IT IS SO ORDERED.

DATE: January 30, 2020

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT